**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 92-7744**
_____


**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**versus**

**GEORGE MICHAEL BASS,**

**Defendant-Appellant.**

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____
(December 14, 1993)

Before GOLDBERG, JONES, and DUHÉ, Circuit Judges

EDITH H. JONES, Circuit Judge:

In the very early morning hours of February 23, 1992, Cameron Parish deputies answered a disturbance call at a motel in Cameron, Louisiana. While at the motel, the deputies ran a check on a 1991 Ford Crown Victoria with Mississippi license plates and learned that the car belonged to Mrs. Modene Hudson, an "involuntarily missing person." The deputies stopped the car and arrested the driver -- defendant/appellant George Michael Bass -- when he failed to produce a driver's license. At the sheriff's department, Bass signed a waiver of rights form and admitted to deputies that he had stolen Mrs. Hudson's car.

Bass was subsequently indicted for interstate transportation of a stolen vehicle in violation of 18 U.S.C. §2312 (Supp. IV 1992) and for interstate transportation of stolen firearms in violation of 18 U.S.C. §§922(i) (1988) and 924(a)(2) (Supp. IV 1992). The morning before trial, the district court denied the defendant's motion to suppress his confession. The government put on its entire case by the end of the same day. The next morning, the district court learned that two of the jurors had seen a newspaper account of the trial. After a separate voir dire of the two jurors in chambers, the court denied defendant's motion for a mistrial, but ultimately excused one of the two jurors from deliberations.

The jury found Bass guilty on both counts, and he appeals his conviction on two grounds. First, Bass complains of a Miranda violation by the deputies. Second, Bass urges that the district court abused its discretion in refusing to grant a mistrial based on the highly prejudicial nature of the newspaper article read by the two jurors. Review of the defendant's arguments leads us to affirm his conviction.

## I.

After hearing the testimony of the Cameron Parish deputies and of the defendant, the district court denied the motion to suppress Bass's confession. The court concluded that it was satisfied that Bass's confession "was voluntarily made with an understanding by the defendant of his Miranda rights." Bass disagrees, contending that he was never properly informed of his

2

<u>Miranda</u> rights and the deputies continued their questioning despite his invocation of the right to counsel. The defendant's contentions, however, are without merit.

Deputies Constance and Nunez testified that Bass was read his <u>Miranda</u> rights at the time of arrest. Constance, Nunez, and deputy Sellers also testified that Bass was read his <u>Miranda</u> rights a second time at the sheriff's department and was asked to sign a waiver of rights form. According to the deputies, Bass refused to sign the waiver of rights form because of some confusion regarding his right to counsel as explained on the form. Specifically, Bass was concerned about his ability to obtain counsel at any time.[1] However, once this confusion was cleared up and Bass was read his rights for a third time, he signed the waiver of rights form and confessed to stealing Mrs. Hudson's car.[2] While this statement was

---

[1]    The source of the confusion was the waiver of rights form and its attempt to summarize -- albeit inartfully -- a defendant's rights upon arrest. The form provided in relevant part:

> Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. <u>We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.</u> If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer.

(emphasis added).

[2]    The deputies testified that -- in response to his concern over the waiver of rights form -- Bass had been told he could request counsel at any time.

being written out by deputy Nunez, Bass invoked his right to counsel.

Bass testified to a very different series of events at the sheriff's department. Bass maintains that when he looked at the waiver of rights form and did not fully understand his right to counsel as described in the form, he requested the presence of an attorney.[3] Notwithstanding this request, the deputies allegedly persisted in questioning him and eventually obtained his signature on a waiver of rights form.

The district court resolved these conflicting versions in favor of the deputies. While recognizing that the waiver of rights form could cause some confusion, the court concluded that Bass was "provided an adequate explanation of his rights and was explicitly advised at least three times that he did not have to answer questions without an attorney present."

We must give credence to the credibility choices and findings of fact of the district court unless they are clearly erroneous. See U.S. v. Restrepo, 994 F.2d 173, 183 (5th Cir. 1993). However, the ultimate issue of voluntariness is a legal question, subject to de novo review. See id. Bass focuses on the former issue and urges us here to make credibility determinations opposite to those of the district court -- namely to credit his testimony at the suppression hearing. Because we cannot say that the district court's credibility choices and fact findings are

---

[3]     Bass did testify that his Miranda rights were read to him on arrest.

4

clearly erroneous, we must decline the defendant's invitation to credit his testimony.             **II.**

On September 11, 1992 -- the second and final day of trial -- an article appeared in the morning edition of the local newspaper ostensibly discussing the defendant's *federal* trial. Unfortunately, the piece disclosed that Bass had been charged with capital murder in the death of Mrs. Hudson and described some of the circumstances surrounding her brutal death.[4]   This brief article noted that Bass, having allegedly strangled Mrs. Hudson, stole her 1991 Ford Crown Victoria and drove it to Louisiana.  The alleged theft and transport of the car to Louisiana formed part of the basis for his federal prosecution.

Once informed of the newspaper article, the district court examined separately in chambers each of the jurors who indicated that they had seen it.  Counsel for both parties were present during and participated in the voir dire of the two jurors, Carter and Seale.

Juror Carter admitted she did not know of the pending capital murder charge against Bass before reading the article. Notwithstanding this, the juror -- under examination by the district court and counsel for the government -- maintained that the article would not affect her ability to make a decision based solely on the evidence at trial.  After instructing her to refrain

---

[4]    The newspaper article failed to explicitly mention that Bass was charged with capital murder in *state* court.  Bass was subsequently tried and convicted on the capital murder charge, and he is presently in prison.

5

from mentioning the article to the other jurors, the district court called in juror Seale.

Juror Seale was not quite as unequivocal in her responses. Specifically, when counsel for the government asked the juror if she understood that her decision was to be based on evidence produced at trial, Seale responded: "Yes, I understand that. I just wish I hadn't read it, you know, because --". The court again instructed the juror not to discuss the article with any other juror.

In his discussion with counsel in chambers, the district court noted that he was "favorably impressed with what [he] ... perceived as an objectivity on the part of both of these ladies and what appeared to me to be candor and frankness." Thus, based on his examination of the jurors, the court denied the defendant's motion for a mistrial. However, in an "abundance of caution," motivated by the somewhat equivocal response of juror Seale, the district court decided to name her an alternate and excuse her prior to deliberations. Also, as part of his general instructions to the jury, the district court instructed the jury that they "must consider only the evidence presented during the trial."

The determination of whether publicity during the trial is so prejudicial as to require a mistrial is within the sound discretion of the district court. See Marshall v. United States, 360 U.S. 310, 312 (1959) (per curiam); United States v. Goodman, 605 F.2d 870, 882 (5th Cir. 1979). An abuse of discretion standard is especially appropriate where the district court finds it

6

necessary to voir dire the jurors as a result of the publicity.[5] The voir dire of jurors to gauge the nature and scope of prejudice, if any, from mid-trial publicity necessarily involves credibility determinations based in part on juror demeanor. See Patton v. Yount, 467 U.S. 1025, 1038 n.14 (1984). The abuse of discretion standard reflects the fact that the district court is in the best position to make such determinations.

In urging that the district court abused his discretion in denying the motion for mistrial, Bass contends that the information contained in the newspaper article was presumptively prejudicial and that no juror could have put the information out of mind and reached an impartial verdict. We disagree.

This court has previously addressed the problem of mid-trial publicity breaches in United States v. Williams, 568 F.2d 464 (5th Cir. 1978). In Williams, a television newscast reported that the defendants had been convicted in a previous trial on the same charges, but that a new trial had been ordered because of "erroneous testimony." Id. at 470. Five jurors knew of the broadcast and two of the five had actually seen all or part of it. See id. Compared to the facts before the Supreme Court in Marshall, where newspaper articles indicated that the defendant had been convicted of other crimes and reached at least seven of the jurors, see Marshall, 360 U.S. at 310 - 11, the Williams panel

_____

[5] The formula for determining if a voir dire is required because of mid-trial publicity is set out in United States v. Herring, 568 F.2d 1099, 1104-05 (5th Cir. 1978).

7

concluded that the mid-trial publicity there was "perhaps even more damaging" than in Marshall. See Williams, 568 F.2d at 470.

The court in Williams focused on the "degree and pervasiveness of the prejudicial influence." Id. More specifically, the court emphasized the extent to which the prejudicial information was probative of guilt. See id. The court noted that it was "hardpressed to think of anything more damning to an accused than information that a jury had previously convicted him for the crime charged." Id. at 471. Thus, because the prejudicial information was more probative of guilt than in Marshall, the court -- following Marshall -- reversed and remanded for a new trial.[6] See id.

Notwithstanding the potential prejudicial impact of the newspaper article on the two jurors in this case, however, we do not believe that Marshall and Williams mandate a reversal of Bass's conviction. First, in Marshall and Williams the prejudicial information had to do with the defendants' *convictions* of other crimes, whereas here, the article stated that Bass was *charged* with -- not convicted of -- capital murder. In short, the information

---

[6]The Supreme Court in Marshall granted a new trial "[i]n the exercise of our supervisory power to formulate and apply proper standards for enforcement of the criminal law in the federal courts." Marshall, 360 U.S. at 313. The use of supervisory power in this context is meant to provide more protection against prejudice than the constitutional standard. See Williams, 568 F.2d at 469.

8

contained in the article is significantly less probative of guilt than in the two leading cases.[7]

Further, the prejudicial influence here -- if any -- is much less pervasive than in Marshall and Williams where the adverse publicity reached a large portion of the jury. Only two out of twelve jurors here had read the article, and since juror Seale was excused prior to deliberations, only juror Carter was potentially prejudiced.

Finally, it may also be argued that some of the information in the article read by jurors Seale and Carter -- namely that Mrs. Hudson had been killed -- had already been intimated during the course of trial. At least three times during this brief, two-day trial, references were made to the owner of the stolen car as "involuntarily missing." But most important, the information conveyed by the article could not have been more prejudicial on the counts for which he was standing trial than Bass's confession of theft.

Recognizing that mid-trial publicity cases each turn on their "special" facts, see Marshall, 360 U.S. at 312, we cannot say that under these circumstances the district court abused his discretion in allowing the jurors to continue to deliberate, especially given his careful, face-to-face assessment of the jurors' demeanor and credibility. Given this factual setting, the district court's repeated admonition to disregard everything not

_____

[7]Arguably the article is not probative of guilt at all. At a minimum, the article is not directly probative of guilt as to the federal offenses for which he was being prosecuted.

9

heard in court was sufficient.  In short, the district judge acted well within his discretion.

## III.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.