# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
September 14, 2016

Lyle W. Cayce
Clerk

No. 15-51204

AARON BROTHERS,
  as Independent Executor of the Estate of William Slade Sullivan;
ROSEMARY CLAUS SULLIVAN,

                        Plaintiffs–Appellees,

versus

OFFICER NATHAN J. ZOSS; OFFICER KRISTEN A. MAYO;
OFFICER AARON P. BALLEW,

                        Defendants–Appellants.

Appeal from the United States District Court
for the Western District of Texas

Before KING, SMITH, and COSTA, Circuit Judges.*
 JERRY E. SMITH, Circuit Judge:

     Officers Nathan Zoss, Kristen Mayo, and Aaron Ballew forcibly removed
William Sullivan from his pickup truck after he refused to comply with their

---

 * Carolyn Dineen King, Circuit Judge, concurs in the judgment only.

No. 15-51204

lawful commands to exit the vehicle. In the process, Sullivan, who was heavily intoxicated, morbidly obese, and handicapped, suffered a serious injury that rendered him a quadriplegic. A few months later, he died.

In the ensuing civil lawsuit, the officers moved for summary judgment based on qualified immunity, which the district court denied, finding that there were genuine disputes of material facts. In so doing, the court erred because, even on plaintiffs' version of the tragic facts, the officers did not violate Sullivan's constitutional rights.

I.

At about 11:30 p.m., Sullivan drove to Rick's Cabaret ("Rick's"), a club, where he drank heavily and by the end of the night had run up a bill of over $400. When he left at about 3:30 a.m., Rick's employees offered to pay for a cab to take him to a nearby hotel. But Sullivan refused, instead asking the employees to drive him and his truck home, as Rick's floor manager had promised at the start of the evening; the manager reneged on his promise. Sullivan therefore demanded his truck keys, which he had entrusted to a Rick's employee earlier in the evening, so that he could charge his cell phone and call a friend to take him home.

Shortly afterward, a Rick's security guard called 911 and requested police assistance to prevent Sullivan from driving under the influence. When Zoss, the first responder, arrived on the scene, Sullivan was in his pickup with the engine running. Zoss approached Sullivan, engaged him in polite conversation, and requested that he exit the truck. Sullivan, however, refused to do so, "because," he told Zoss, "you're going to arrest me." Zoss then warned Sullivan that he would be arrested if he did not step out of the vehicle. Sullivan slowly opened the door but immediately closed it when Zoss reached for the handle.

2

No. 15-51204

Because of Sullivan's noncompliance, Zoss and fellow officers Mayo and Ballew decided to resort to force.  Mayo moved Zoss's police cruiser in front of Sullivan's pickup to try to prevent him from driving off, while Ballew drew his gun and pointed it at Sullivan.  When Sullivan dropped his hands from view, Zoss also drew his weapon and ordered Sullivan to put his hands on his face. Sullivan eventually moved his hands back into view but, despite Zoss's repeated orders, did not put his hands on his face.

At Zoss's command, Mayo opened the driver's door and told Sullivan to get out.  Sullivan told her to "hold on" as he took a phone call.  Mayo grabbed onto his left arm and attempted to pull him from the truck, but, because of his great weight, she was unable to move him.[1]  Zoss came over to help.  He reached over Sullivan's body to grab his right arm, and then Zoss and Mayo pulled Sullivan out of the vehicle, which was a large, elevated pickup.  In the process, Sullivan fell and slammed hard into the pavement.  He did not use his feet to brace his fall; nor could he use his hands, because Zoss and Mayo were holding onto them.

Immediately after Sullivan hit the ground, he yelled, "Ow, oh my back." The officers handcuffed him.  When they attempted to sit him up, he informed them that he had broken vertebrae.  The officers therefore stopped moving him and called for medical assistance.

Aaron Brothers, to whom Sullivan had conveyed power of attorney, sued the City of Round Rock, Zoss, Mayo, and Ballew under 42 U.S.C. § 1983, alleging excessive force in violation of the Fourth and Fourteenth Amendments.[2]

---

[1] Though only 5'10", Sullivan weighed approximately 350 pounds.

[2] After Sullivan's death, Brothers, as independent executor of Sullivan's estate, was substituted as the proper plaintiff.  Sullivan's mother was also added as a plaintiff.  The complaint originally named two other police officers, who were dismissed after the plaintiffs ascertained that they had not been involved in Sullivan's injury.  Amended complaints added

No. 15-51204

The officers moved for summary judgment based on qualified immunity. The district court denied the motion, but disclaimed to rule directly on the defense, stating that it wanted to wait until "the record is fully developed through trial" to rule on qualified immunity.

II.

We review *de novo* the denial of summary judgment based on qualified immunity. *Kovacic v. Villarreal*, 628 F.3d 209, 211 (5th Cir. 2010). In denying such a motion, the trial court makes two determinations. First, it "decides that a certain course of conduct would, as a matter of law, be objectively un-reasonable in light of clearly established law. Second, the court decides that a genuine issue of fact exists regarding whether the defendant(s) did, in fact, engage in such conduct." *Kinney v. Weaver*, 367 F.3d 337, 346 (5th Cir. 2004) (en banc). On interlocutory appeal, this court generally has jurisdiction to "review the materiality of any factual disputes, but not their genuineness." *Hogan v. Cunningham*, 722 F.3d 725, 730–31 (5th Cir. 2013).

The Supreme Court has created a narrow exception to this jurisdictional limitation where the record blatantly contradicts one party's version of events. *Curran v. Aleshire*, 800 F.3d 656, 663–64 (5th Cir. 2015). In *Scott v. Harris*, 550 U.S. 372 (2007), the Court rejected the plaintiff's version because it was clearly contradicted by video evidence. *Harris* authorizes "assign[ing] greater weight . . . to the facts evident from video recordings taken at the scene."[3] "When one party's description of the facts is discredited by the record, we need not take his word for it but should view 'the facts in the light depicted by the

---

Rick's and its parent company as defendants.

[3] *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011)).

No. 15-51204

videotape.'"[4]

The district court ruled that there were genuine disputes as to material facts. The officers urge us to review the genuineness in light of the video evidence and *Harris*'s exception to the jurisdictional limitation. We agree with the plaintiffs, however, that the video evidence does not unequivocally disprove their version of events, which we therefore accept for purposes of this appeal.[5]

III.

Qualified immunity provides government officials with immunity from suit—not merely a defense to liability for civil damages—"insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[6] It thus involves two inquiries: "A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in light of clearly established law at the time of the violation."[7] These inquiries can be made in any order. *Callahan*, 555 U.S. at 227. Both are matters of law for the court.[8]

---

[4] *Id.* (quoting *Harris*, 550 U.S. at 380–81).

[5] In particular, we accept plaintiffs' allegations that the officers were aware both that Sullivan was morbidly obese and that he was handicapped and was morbidly obese and that he had back problems; his neck and shoulders were hunched over, and he was unable to turn his head without turning his entire body. Moreover, although Sullivan did not park in a handicapped parking space, a handicapped placard hung from his rearview mirror.

[6] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[7] *Cowart v. Erwin*, No. 15-10404, --- F.3d ---, 2016 U.S. App. LEXIS 16736, at *16 (5th Cir. Sept. 13, 2016) (footnote omitted).

[8] *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014) ("[Petitioners] contend that their conduct did not violate the Fourth Amendment and, in any event, did not violate clearly established law. Thus, they raise legal issues . . . .); *Harris*, 550 U.S. at 381 n.8 ("At the summary judgment stage . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, the

No. 15-51204

At the first step of the qualified-immunity inquiry, the record shows that, even accepting (as we do) the plaintiffs' version of the facts, the officers did not violate Sullivan's constitutional rights. Although plaintiffs allege excessive force under the Fourth and the Fourteenth Amendments,[9] we are instructed to analyze "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen . . . under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989). We thus consider only whether the officers violated Sullivan's Fourth Amendment right to be "'secure in [his] person[] . . . against unreasonable . . . seizures' of the person." *Id.* at 394.

To succeed on an excessive-force claim under the Fourth Amendment, plaintiffs must demonstrate "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and that (3) the force used was objectively unreasonable."[10] In this procedural posture, though plaintiffs have no trouble satisfying the first two prongs, they are unable to meet the

---

reasonableness of [the officer's] actions—or, in Justice Stevens' parlance, 'whether [the plaintiff's] actions have risen to a level warranting deadly force'—is a pure question of law." (some alterations in original) (internal citations omitted)).

[9] The officers assert that plaintiffs have also alleged deprivation of "rights under the Americans with Disabilities Act" ("ADA"). The plaintiffs, however, deny bringing any claim under the ADA, and the complaints do not assert any cause of action under it, whether against the officers or the city. Issues pertaining to the ADA are thus not properly before this court.

The irrelevance of the ADA notwithstanding, the district court issued a ruling on the applicability of Title II of the ADA. The officers lack standing to appeal that ruling because Title II does not apply to individuals. The city will be able to appeal that ruling if it suffers an adverse final judgment.

[10] *Hogan*, 722 F.3d at 734 (quoting *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004)). An equivalent formulation found in other cases is "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)).

third because, even on the facts alleged and drawing all reasonable inferences in their favor, the officers' conduct was objectively reasonable.

In excessive-force claims under the Fourth Amendment, the reasonableness of an official's conduct depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The court must adopt "the perspective of a reasonable officer on the scene, rather than [judge] with the 20/20 vision of hindsight." *Id.*[11] "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. "As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

The *Graham* factors support the decision to resort to force. Sullivan's crimes were serious: driving while intoxicated and interfering with the duties of a public servant. A reasonable officer, moreover, could have perceived him as an immediate threat. As long as Sullivan remained in his pickup, he posed

---

[11] *Accord Ramirez v. Knoulton*, 542 F.3d 124, 129–30 (5th Cir. 2008) ("'A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.' *United States v. Sharpe*, 470 U.S. 675, 686–87 . . . (1985). 'The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.' *Id.* at 687.").

a potential danger to the officers and others.[12]  A motor vehicle can be used as a dangerous weapon, even when blocked in by a police cruiser.  *See, e.g.*, *Rickard*, 134 S. Ct. at 2021–22 (car chase despite police blockade).  And a reasonable officer could have feared that Sullivan might have a weapon on his person or in the pickup.  *See Reese v. Anderson*, 926 F.2d 494, 500–01 (5th Cir. 1991).  Finally, he resisted arrest, refusing to comply with the instructions to get out of his vehicle and closing his door in Zoss's face.[13]

Because Sullivan was not in the midst of harming other individuals and because his resistance was mostly passive, the officers were entitled to use only a proportional amount of force.  We agree with the officers, though, that the force they employed was moderate.  Although Ballew and Zoss drew their guns during the encounter, they never used them or any other weapon on Sullivan but merely used their hands to pull Sullivan from his vehicle.  Nor did any of the officers gratuitously strike Sullivan.  The only force they employed was pursuant to and required for removing him from the truck.[14]

The officers did not pull Sullivan with excessive force but, instead, slowly escalated the amount of force until it was enough to extract him.  They began with a single arm bar.  Mayo opened the door and attempted to pull Sullivan out by his left arm, but she was unable to move him on account of his great

---

[12] *See Smith v. Ball State Univ.*, 295 F.3d 763, 769 (5th Cir. 2002) ("Smith posed a threat to himself, the officers and the general public, even after Officer Foster turned off Smith's vehicle and attempted unsuccessfully to communicate with him.  Indeed, contrary to Smith's assertions, his unresponsiveness did not neutralize the safety threat, but rather exacerbated it by adding an element of unpredictability.").

[13] *See Deville*, 567 F.3d at 167 ("Officers may consider a suspect's refusal to comply with instructions during a traffic stop in assessing whether physical force is needed to effectuate the suspect's compliance.").

[14] In the district court, plaintiffs maintained only that the officers employed excessive force in pulling Sullivan from his vehicle.  They did not allege excessive force in handcuffing him, so that argument has been waived.  *See Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 601 (5th Cir. 2005).

weight. Zoss thus came to her assistance and grabbed Sullivan by his right arm. Together, both officers repeatedly attempted to pull Sullivan out of the truck but succeeded only when they leaned back and put all of their weight into pulling.

The unfortunate result—Sullivan's falling on his chest and stomach—was not foreseeable. A reasonable officer could not have predicted that Sullivan would not use his feet to brace his fall. Moreover, given the speed at which Sullivan hit the ground, a reasonable officer could not have been expected immediately to recognize that Sullivan was about to hit the ground, that the officers would be unable to lower his 350 pounds in a controlled manner, or that they should let go of his arms so that he could use them to catch himself.

We reject plaintiffs' characterization of the force as "tantamount to deadly force" merely because it resulted in serious injury. Force is not necessarily deadly even where it results in death.[15] The plaintiffs posit, however, that the officers could have acted differently. In particular, they could have spent more time negotiating with Sullivan. In denying qualified immunity, we have placed weight on the quickness with which law enforcement personnel have escalated from negotiation to force. *See, e.g.*, *Newman*, 703 F.3d at 763; *Deville*, 567 F.3d at 167–68. The approximately two minutes that Zoss spent negotiating with Sullivan before deciding to resort to force was not objectively unreasonable, especially in light of, *inter alia*, Sullivan's explicit and repeated refusal to comply with Zoss's requests to exit the pickup and the possibility

---

[15] *Cf. Mullenix v. Luna*, 136 S. Ct. 305, 312–13 (2015) (Scalia, J., concurring) ("It does not assist analysis to refer to all use of force that happens to kill the arrestee as the application of deadly force. The police might, for example, attempt to stop a fleeing felon's car by felling a large tree across the road; if they drop the tree too late, so that it crushes the car and its occupant, I would not call that the application of deadly force. Though it was force sufficient to kill, it was not applied with the object of harming the body of the felon.").

that Sullivan might have had access to a weapon or could have tried to drive his huge, elevated truck into the police car.

The order denying qualified immunity is REVERSED, and this matter is REMANDED for entry of dismissal as to the three officers and for further proceedings as needed.